UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AMY COLEMAN, M.D.                                                                                         PLAINTIFF

V.                                                                         CIVIL ACTION NO. 3:24-CV-156-DPJ-LGI

MERIDIAN IMAGING, P.A.                                                                               DEFENDANT

ORDER

When Amy Coleman, MD, voluntarily left her job with Meridian Imaging, PA, the noncompete clause in her employment agreement barred her from practicing in the Meridian area for two years.  Dr. Coleman sued the practice, alleging that the clause violates Section 1 of the Sherman Act and state law.  Now Meridian Imaging moves for summary judgment [112].  The Court denies the motion.

I.      Background

Dr. Coleman, a radiologist who completed a fellowship in breast imaging, went to work for Meridian Imaging in 2010 when her husband, also a radiologist, joined its staff.  Coleman Dep. [116-2] at 15:1–9, 23:3–20.  Dr. Coleman signed an employment contract that included a noncompete agreement (NCA).  Empl. Agr. [116-3] § 7.2.  The NCA stated that if she left Meridian Imaging, she would be precluded from offering radiology services for two years within 45 miles of Meridian.  *Id.*

In October 2023, Dr. Coleman gave the practice 90 days' notice.  Ltr. [116-16].  About two months later, in December 2023, her attorney emailed Stacy Thaggard, MD, Meridian Imaging's CEO, to ask for release from the NCA.  Waide Ltr. [116-18].  Defendant's attorney responded that the practice would "fully enforce it."  Butler Email [116-19].

Dr. Coleman hoped to work for one of Meridian, Mississippi's two main hospitals, Ochsner Rush or Baptist Anderson.  Kennedy Dep. [116-20] at 10:16–21; Cranford Email [116-

23].  Ochsner Rush's CEO had some interest in hiring Dr. Coleman, but he said she would have to resolve the NCA issue first.  Kennedy Dep. [116-20] at 10:8–11:10.  Baptist Anderson's CEO was also interested in hiring Dr. Coleman, but the recruiter from the hospital's parent company declined.  Anderson Dep. [116-25] at 18:14–23, 25:4–21, 36:1–16, 50:11–17.  Anderson's CEO claimed not to know precisely why Dr. Coleman was not hired, *id.* at 65:1, though he said her "production did not meet a standard that Baptist typically uses," *id.* at 65:6–8.  He also testified that Baptist Anderson would not interfere with an NCA.  *Id*. at 33:1–14.

Unable to find work in Meridian, Dr. Coleman has been working for out-of-state providers.  Coleman Dep. [116-2] at 101:6–106:22.  So in March 2024, she sued Meridian Imaging, alleging that it violated the Equal Pay Act, the Sherman Antitrust Act, and Mississippi statutory and common law.  Compl. [1].  She has dismissed her Equal Pay Act claim.  *See* Feb. 18, 2025 Text Order granting Mot. to Dismiss [111].  Briefing has closed on the remaining claims.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[ ] and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id*. at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014). But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his claim. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n.7 (5th Cir.), *cert. denied,* 506 U.S. 832 (1992). And disputed fact issues that are "irrelevant and unnecessary" to deciding the motion will not be considered by the Court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

III.   Discussion

Four claims remain for alleged violations of (1) the Sherman Act, (2) Mississippi Code section 75-21-1(a), (3) Mississippi common law on NCAs, and (4) Mississippi common law on

intentional interference with future employment. Meridian Imaging asks that Dr. Coleman's Sherman Act claim be dismissed and that the Court decline to exercise supplemental jurisdiction over her state-law claims. It alternatively argues that those claims should be dismissed on their merits.

    A.    The Sherman Act

The Sherman Act, 15 U.S.C. § 1, prohibits the enforcement of contracts which are "in restraint of trade or commerce among the several States." This broad language in practice forbids only "unreasonable restraints." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008).[1]

"Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action." *Abraham & Veneklasen J.V. v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015). Ordinarily, a successful § 1 claim must "show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Id.* (quoting *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996)).

        1.    Merits Arguments

***Concerted activity.*** In its opening memorandum, Meridian Imaging makes one primary merits argument—that Dr. Coleman hasn't shown the practice conspired with any competitors. Def.'s Mem. [113] at 12. As it correctly notes, "a corporation cannot conspire with its officers or

---

[1] Meridian Imaging addresses Section 2 as well, but Dr. Coleman neither invoked that section in her Complaint nor argued it in response to Defendant's summary-judgment motion. If she intended this claim—which is not apparent—then she abandoned it. *See Doe v. Bd. of Supervisors of Univ. of La. Sys.*, 650 F. Supp. 3d 452, 476 n.13 (M.D. La. 2023).

employees." *Id.* at 11 (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir. 1981)).

To start, a "conspiracy" in this context is different. As the Supreme Court has explained, § 1 "reaches unreasonable restraints of trade effected by a **'contract, combination . . . or conspiracy'** between *separate* entities." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quoting *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968)) (boldfacing added). Thus, "a conspiracy" under § 1 means "simply an 'agreement'—we use the two interchangeably unless otherwise noted." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022).

With that definition in mind, the relevant conduct here is between Dr. Coleman and the practice. As one noted commentary states, "the employee agreement not to compete is made between the purchaser (employer) and seller (employee) of employment services." Areeda & Hovenkamp, *Antitrust Law* § 2033.[2] Such a "vertical" agreement "may prohibit employees from going to work for a competitor for a given period after employment with the former employer comes to an end." *Id.* § 1809. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-CV-205, 2018 WL 3032552, at *12 (S.D. Cal. June 19, 2018) (citing Areeda treatise for verticality of employee NCAs).

Though Fifth Circuit authority is somewhat limited, the circuit has recognized that § 1 applies to such agreements in the employment context. *Wegmann v. London*, 648 F.2d 1072,

---

[2] The Areeda treatise has often been cited by the Supreme Court. *See, e.g., Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 942 n.8 (2025) (citing "the prominent Areeda and Hovenkamp treatise"); *NCAA v. Alston*, 594 U.S. 69, 86 (2021); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007).

1073–74 (5th Cir. 1981). To reach that conclusion, the *Wegmann* court favorably cited the Second Circuit's holding that

> employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. *See* Blake, Employee Agreements Not To Compete, 73 Harv. L. Rev. 625, 627 (1960). Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.

*Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977).

While Defendant's cited authority, *Dussouy*, does say corporations may not conspire with themselves, 660 F.2d at 603, it did not address an NCA, *id.* at 596. And based on *Wegmann*, the Court finds that an NCA between an employer and employee can violate § 1.

Nor does it matter that Dr. Coleman, the Plaintiff, herself formed the challenged contract with the Defendant. "[A]n agreement between a plaintiff and a defendant clearly may serve as the basis of [a] section 1 complaint." *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 856 (1st Cir. 1985) (citing *Copperweld Corp.*, 467 U.S. at 764 & n.9). *See Woolf v. S.D. Cohn & Co.*, 521 F.2d 225, 227 (5th Cir. 1975) (recognizing unavailability of *in pari delicto* defense to antitrust action). Thus, Meridian Imaging's argument that Dr. Coleman's § 1 claim fails for want of a "conspiracy" lacks merit.

***Per se violation.*** Dr. Coleman mentions per se violations in her response, but she offers little substantive analysis explaining why that theory applies here. It doesn't. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988). The Court has already concluded that the NCA between Dr. Coleman and Meridian Imaging is a vertical restraint. And absent an exception for price fixing, a vertical restraint doesn't per se

6

violate the Sherman Act. *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001). Dr. Coleman does not allege price fixing, so her per se argument must fail.

*Rule-of-reason violation.* The parties dispute whether the NCA violates § 1 under a rule-of-reason analysis. The Fifth Circuit has described the test:

> Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition. The court's considerations should include the restrictive practice's "history, nature, and effect" and "[w]hether the businesses involved have market power." Market power has been defined as "the ability to raise prices above those that would be charged in a competitive market." The rule of reason analysis also requires that the plaintiff show that the defendants' activities injured competition. The rule of reason is designed to help courts differentiate between "restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Regardless of which rule applies, the court's inquiry should ultimately focus upon "form[ing] a judgment about the competitive significance of the restraint."

*Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 374 (5th Cir. 2014) (citations omitted; alterations in *Marucci*). This inquiry considers "all of the circumstances." *Id*. Direct evidence of harm to competition can include "reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 585 U.S. at 542.[3]

Starting with the history of this restrictive practice, NCAs in the employment context go back at least to English law in 1711, as does their examination under the rule of reason. *Snepp v. United States*, 444 U.S. 507, 519 (1980) (Stevens, J., dissenting) (citing *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (1711)). The rule of reason traditionally "requires that the covenant be reasonably necessary to protect a legitimate interest of the employer (such as an interest in confidentiality)"

---

[3] In *Ohio v. American Express Co.*, the Supreme Court applied a "three-step, burden-shifting framework." 585 U.S. 529, 541 (2018). Neither side engages this test beyond the first step, so the Court limits its review to that issue—whether Dr. Coleman shows "a substantial anticompetitive effect that harms consumers in the relevant market." *Id.*

7

but "that the employer's interest not be outweighed by the public interest." *Id*. (Stevens, J., dissenting).

Turning to anticompetitive effect, Dr. Coleman argues that the NCA "deprives the Meridian market" of a radiologist with her specialty and experience, which "increases the chances that cancers are not detected." Pl.'s Mem. [117] at 13. She offers evidence that this market's needs for breast imaging are going unmet. *Id*. Only one radiologist in the area, she says, offers comparably high-quality breast imaging. *Id*. at 14. She supports that with testimony from a local surgeon, Dr. Lee Thornton, and a local oncologist, Dr. Matt Cassell. *Id*. at 13–14.

Dr. Thornton testified that "the needs of the community for good, adequate detection of breast cancer" are "worse off" with Dr. Coleman no longer practicing there. Thornton Dep. [116-7] at 14:15–21. Since she left the market, "we've certainly had to delay patients and kind of try to shift their care over to Dr. [Sandy] Pupa"—the other breast-imaging specialist in the area—who "stopped taking new patients many years ago." *Id*. at 10:15–11:7, 12:13–13:21. "[B]oth of these doctors," apparently Drs. Pupa and Coleman, "are absolutely slammed" with work. *Id*. at 19:3–13. He agrees that "the Meridian area would be better off medically and safety would be improved if Dr. Coleman were allowed to practice in Meridian." *Id*. at 21:12–16.

Dr. Cassell testified that Dr. Coleman had done "all our mammography, all our breast imaging, which finds the majority of cancers through the Anderson or Baptist Anderson system." Cassell Dep. [116-14] at 7:16–23. His oncology group addressed "breast imaging that needed to be done or if we had to discuss some findings on there . . . probably 95 percent of the time with her when she was here." *Id*. at 8:20–25. Dr. Cassell is aware of only one other Meridian physician who has "specialized in breast imaging," and she is "more involved with Ochsner

Rush" than with the Anderson hospital. *Id*. at 9:6–10.  He believes breast patients in Meridian are "worse off from a breast imaging standpoint" without Dr. Coleman practicing. *Id*. at 10:5–11.  In his view, "ladies now are not receiving that level of care" they had with Dr. Coleman.  *Id*. at 16:8–14.  Consistent with that, Ochsner Rush called Meridian Imaging to explore whether "there was any potential for her to stay in the market *knowing we had a need*."  Kennedy Dep. [116–20] at 11–12 (emphasis added).

Meridian Imaging puts a different spin on this evidence, but the facts remain disputed. For example, it correctly notes that Dr. Thornton also said, "Meridian's breast care needs are being met."  Def.'s Reply [120] at 9 (citing Thornton Dep. [116-7] at 40).  Looking at pages 39 to 40 of Dr. Thornton's deposition, he does agree that "[g]eneral breast care" needs are being met but does not say the same for specialty breast care.  Thornton Dep. [116-7] at 39:2–11.  The practice also cites Dr. Cassell as saying that "the same procedures are being performed now as when Coleman was practicing and that his quality of care has remained the same."  Def.'s Reply [120] at 9 (citing Cassell Dep. [116-14] at 24–25).  That said, he also testified that the other radiologists are doing the same procedures but without "the level of confidence in [Dr. Coleman's] expertise."  Cassell Dep. [116-4] at 24:9–14.  He believes he is providing the same level of care but whether "we're catching as many cases or people are satisfied" without Dr. Coleman's services, "that I can't speak for."  *Id*. at 25:12–19.

Otherwise, Meridian Imaging denies that Dr. Coleman has shown any "harm to competition."  Def.'s Reply [120] at 8.  And it offers its own countervailing evidence. *See id.* at 9–10.  But the Court must view the evidence in the light most favorable to Dr. Coleman.  And the practice does not dispute that Meridian now has only one radiologist specializing in breast

9

imaging or that this specialist is mainly associated with one of the two area hospitals. Two local doctors believe that care has been delayed and that the market is worse off.

As for "market power," its relevance may be lesser or greater in some cases:

> It is thus often useful to ask **how the firm imposing a restraint expects to profit from it**. Will the likely source of the profit be reduced costs or an improved product or service? Or will it be higher prices (**or lower quality**) that result from an exercise of market power? If the answer is **relatively clearly the latter**, then defining a market and measuring a market share will add little.

Areeda & Hovenkamp, *Antitrust Law* § 1503 (emphasis added). *See Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978) (noting change in "quality" may affect market-power analysis). Again, Meridian Imaging's NCA is blocking one of only two breast-imaging specialists in the Meridian area. Whether that diminishes the quality of care is a question of fact based on the testimony from Drs. Thornton and Cassell.

Meridian Imaging nevertheless argues that "[i]n virtually every reported case that has considered a similar fact pattern, the conclusion has been the same: the exclusion of one doctor does not give rise to Sherman Act liability." Def.'s Reply [120] at 11 (citing *Benson v. St. Joseph Reg'l Health Ctr.*, 575 F.3d 542, 549–50 (5th Cir. 2009); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area*, 36 F.3d 664, 667–68 (7th Cir. 1994)). This authority is easily distinguished.

As argued, *Benson* and *BCB Anesthesia* both recognize that "staffing decision[s] at a single hospital [are] not a violation of section 1 of the Sherman Act." *Benson*, 575 F.3d at 550 (quoting *BCB Anesthesia*, 36 F.3d at 667–68). But the doctors in those cases were not precluded from practicing elsewhere. As *Benson* explained, the doctor there remained free to practice at other clinics. 575 F.3d at 549. Thus, "[t]he inability to service patients at the hospital of his choice does not demonstrate an unreasonable adverse impact on OB/GYN services for the entire county." *Id*. By contrast, Dr. Coleman *is* precluded from practicing, and she has created a fact

10

question whether that decreases medical services in this small community. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc) (holding antitrust claim failed because plaintiff "neither demonstrated a rise in the price of medical services above a competitive level nor a decrease in the supply of doctors in the relevant market").

For these reasons, the Court finds Dr. Coleman has shown genuine fact questions about whether the NCA violates the rule of reason. This conclusion should not be mistaken for a general one about all employment NCAs or even about those in the medical field. The Court's finding is limited, as it must be under the rule of reason, to Dr. Coleman's facts.

    3.    Section 1 Standing[4]

"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15. There is, however, a heightened standing requirement in antitrust suits. *McCormack v. NCAA*, 845 F.2d 1338, 1341 (5th Cir. 1988). "Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp.*, 123 F.3d at 305 (citing *McCormack*, 845 F.2d at 1341).

***Injury-in-fact.*** Meridian Imaging finds it "unclear" whether Dr. Coleman can meet this element because she never "claimed an intention to start her own radiological business or practice," versus "seeking employment opportunities with" other organizations. Def.'s Mem. [113] at 15.

---

[4] The Court, following Meridian Imaging's order of briefing, has deferred what would ordinarily be a threshold question. That's partly because the Fifth Circuit has noted that summary judgment on the merits is preferable to dismissing for lack of antitrust standing. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997) (affirming summary judgment) (citing Areeda & Hovenkamp, *Antitrust Law* § 360f (1995 ed.)).

Meridian Imaging never explains this distinction, and the Fifth Circuit has held that "one who has been damaged by loss of employment as a result of a violation of the antitrust laws is 'injured in his business or property' and thus entitled to recovery." *Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc.*, 540 F.2d 824, 830 (5th Cir. 1976) (quoting *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 334 (7th Cir. 1967)). Dr. Coleman offers competent record evidence that she was denied employment—at least by Ochsner Rush—because of the NCA. Kennedy Dep. [116-20] at 10:8–11:10. Without more analysis from Meridian Imaging, the Court will not dismiss the case on this basis.[5]

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Catrett*, 477 U.S. at 322. But the movant must first explain "the basis for its motion." *Id*. at 323. Without identifying any authority stating that injury-in-fact requires being thwarted in starting up one's own business, Meridian Imaging has not shown any failure of proof on Dr. Coleman's part.

***Antitrust injury.*** This is the element the Fifth Circuit cautioned about in *Doctor's Hospital*: "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace." 123 F.3d at 305. The antitrust treatise already cited states: "An employee overcomes the primary hurdle to standing when he or she shows that the alleged violation restrains competition in the labor market." Areeda & Hovenkamp, *Antitrust Law* § 352. The Fifth Circuit held that a plaintiff's "alleged losses and competitive disadvantage" because of a defendant's action "fall easily within the conceptual bounds of

---

[5] Meridian Imaging objects to two of Dr. Coleman's exhibits on this point (plus a third). *See* Def.'s Reply [120] at 2-4. None of them impact the analysis.

antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp.*, 123 F.3d at 305.  The Court finds the same here.

***Proper plaintiff.***  Finally, courts must "examin[e] such factors as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *McCormack*, 845 F.2d at 1341.

Meridian Imaging devotes considerable attention to Dr. Coleman's supposed failure to meet the proper-plaintiff requirement.  Def.'s Mem. [113] at 16–18.  It argues that because Dr. Coleman says the NCA's anticompetitive effects have decreased the quality of breast-imaging services, "the patients who are actually injured by the non-compete are the proper plaintiffs, not Coleman." *Id*. at 17.  Dr. Coleman counters that she was "directly harmed" and therefore is a proper party.  Pl.'s Mem. [117] at 20.

The Court is not convinced by Meridian Imaging's primary authority.[6]  The two cases it cites were distinguished in a more analogous antitrust case—*Doctors Hospital of Laredo v. Cigarroa*, No. SA-21-CV-1068, 2022 WL 3567353, at *9 (W.D. Tex. Aug. 17, 2022).  There, the court rejected the argument that "acute cardiology patients and the parties paying for those services are the proper parties to bring this antitrust suit." *Id.*  The district court noted that the plaintiffs had alleged "distinct injuries . . . including . . . lost revenues [and] competitive disadvantages." *Id*. at *11.  Because this harm to the plaintiffs was "distinct from any increased costs that insurers or consumers may have suffered" from the alleged restraint of trade, for which

---

[6] *Baglio v. Baska*, 940 F. Supp. 819 (W.D. Pa. 1996), and *Ginzburg v. Mem'l Healthcare Sys., Inc.*, 993 F. Supp. 998 (S.D. Tex. 1997).

"no insurer or customer could recover," the court held that the plaintiff providers were proper plaintiffs. *Id*. For much the same reasons, the Court finds that Dr. Coleman is also a proper plaintiff.

Thus, Dr. Coleman has met her burden to show antitrust standing under 15 U.S.C. § 15, and summary judgment is denied on her claim under 15 U.S.C. § 1.

B.  Restraint of Trade Under Miss. Code Ann. § 75-21-1(a)

Dr. Coleman also pursues her antitrust claim under Mississippi Code section 75-21-1(a), which creates a cause of action for entering a "trust or combine."

> A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be: (a) To restrain trade.

*Id.*

The parties treat this claim as coterminous with Dr. Coleman's Sherman Act § 1 claim. Def.'s Mem. [113] at 10 & n.38; Pl.'s Mem. [117] at 20. That seems fair. *See Waggoner v. Denbury Onshore, LLC*, No. 3:12-CV-257-HTW-LRA, 2014 WL 11290898, at *3 (S.D. Miss. Mar. 31, 2014) (accepting parties' claim that Mississippi antitrust law is "analytically identical" to federal antitrust law), *aff'd*, 612 F. App'x 734, 736 n.2 (5th Cir. 2015). And because Meridian Imaging supplies no grounds for summary judgment on this count apart from its Sherman Act briefing, the Court denies summary judgment for the reasons already stated.

C.  Restraint of Trade Under Mississippi Common Law

Meridian Imaging says Dr. Coleman's briefing drops her claim that the NCA violates Mississippi common law. Def.'s Reply [120] at 2. That's true only of her brief's headings. At pages 21 to 24, she makes common-law arguments against upholding the NCA.

The practice relies mainly on the aged yet valid *Wilson v. Gamble*, 177 So. 263 (Miss. 1937). Def.'s Mem. [113] at 25. There, the Mississippi Supreme Court held that the authorities supporting employment NCAs are "legion." *Wilson*, 177 So. at 365–66. That court affirmed an order upholding an NCA against two physicians, finding that the terms were reasonable. *Id.* at 366. It also observed that the "public interest" would not suffer because the remaining "number of physicians . . . is amply sufficient for the rendition of necessary medical services." *Id.*

Since *Wilson*, Mississippi courts have continued to consider the "public interest." *Id.* For example, the Mississippi Supreme Court revisited *Wilson* in *Donahoe v. Tatum*, noting that the lack of harm to the public interest was part of "the general principles pertaining to such restrictive covenants." 134 So. 2d 442, 445 (Miss. 1961). Thus, courts applying Mississippi law must consider not only the reasonableness of the restrictions but also "the rights of the employer, the rights of the employee, and the rights of the public." *Thames v. Davis & Goulet Ins., Inc.*, 420 So. 2d 1041, 1043 (Miss. 1982) (quoting *Tex. Rd. Boring Co. of La.-Miss. v. Parker*, 194 So. 2d 885, 888 (Miss. 1967)); *accord Brown & Brown of Miss., LLC v. Baker*, No. 1:16-CV-327-LG-RHW, 2018 WL 8805937, at *3 (S.D. Miss. Apr. 10, 2018). Indeed, "Mississippi courts have repeatedly held that non-competition agreements are 'restraint[s] of trade and individual freedom and are not favored by the law.'" *Allen & Smith Ins. Agency Inc. v. Merrill*, No. 2023-CA-468-COA, 2025 WL 1441926, at *8 (Miss. Ct. App. May 20, 2025) (quoting *Landry v. Moody Grishman Agency Inc.*, 181 So. 2d 134, 139 (Miss. 1965)).

For the same reasons discussed under the Sherman Act, Dr. Coleman has created a fact question about the impact on the public. Summary judgment is denied on this count.

15

D.   Tortious Interference with Business Relations

Finally, Dr. Coleman accuses Meridian Imaging of intentionally interfering with her attempts to obtain employment in the Meridian area. To make this claim, she must prove four elements:

(1) The acts were intentional and willful;

(2) The acts were calculated to cause damage to the plaintiffs in their lawful business;

(3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice);

(4) Actual damage and loss resulted.

*NCAA v. Farrar*, 402 So. 3d 1251, 1263–64 (Miss. 2024) (quoting *MBF Corp. v. Century Bus. Commc'ns, Inc.*, 663 So. 2d 595, 598 (Miss. 1995)).

Dr. Coleman argues that Meridian Imaging has intentionally enforced the NCA to injure her medical practice in the Meridian area, leaving her unable to work there, and that the practice did so with an unlawful purpose given that her NCA is an unlawful restraint of trade. Pl.'s Mem. [117] at 27–29. Meridian Imaging denies that it ever actively discouraged another provider from hiring her. Def.'s Mem. [113] at 20–21. But the practice quotes a Mississippi case holding that even "giving information that is completely accurate" may be tortious interference "when the purpose was to cause interference and injury results." *Id*. at 20 (quoting *Morrison v. Miss. Enter. for Tech., Inc.*, 798 So. 2d 567, 575 (Miss. Ct. App. 2001)).

The practice can't deny informing Ochsner Rush that Dr. Coleman signed the NCA. *Id*. at 21–22. Rather, Meridian Imaging says its enforcement of the NCA "constituted an action that was duly authorized by" the NCA itself. *Id*. at 21. That seems to beg the question whether the contract was valid. In any event, the evidence related to this claim overlaps the evidence

16

supporting the Sherman Act claim.  The Court therefore finds "a better course would be to proceed to a full trial." *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (holding that trial court has discretion to deny summary judgment "even if the standards of Rule 56 are met") (quoting *Liberty Lobby*, 477 U.S. at 255–56).

IV.   Conclusion

The Court has considered all arguments presented.  Any not expressly addressed here would not affect the outcome.  Meridian Imaging's motion for summary judgment [112] is denied.

**SO ORDERED AND ADJUDGED** this the 2nd day of June, 2025.

s/ *Daniel P. Jordan III*  
UNITED STATES DISTRICT JUDGE
